569 A.2d 1224

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Abraham Paul KOROTKI.

Misc. (Subtitle BV) No. 24, Sept. Term, 1988.

Court of Appeals of Maryland.

Feb. 21, 1990.

648

Melvin Hirshman, Bar Counsel, and Walter D. Murphy, Jr., Deputy Bar Counsel, for Atty. Grievance Com'n of Maryland.

Paul D. Bekman, Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE and ADKINS, JJ., and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals (retired, Specially Assigned).

RODOWSKY, Judge.

This professional discipline matter arises out of the personal injury claims of five persons, asserted in a single action. Plaintiffs' counsel in that action, the respondent herein, Abraham Paul Korotki (Korotki), charged his clients a contingent fee of seventy-five percent of the gross amount recovered after trial and appellate review. Two of the clients were charged fees totaling $471,424.36 on their combined gross recoveries of $628,565.81. Their complaints to Bar Counsel led to charges against Korotki which were heard before Judge Dana M. Levitz of the Circuit Court for Baltimore County. He found "that the manner and circumstances surrounding the modification of the contingent fee agreement ... from 40 percent, [to 60 percent,] to 75 percent make the fee ultimately charged clearly excessive," in violation of then governing Disciplinary Rules 2–106 and 5–103(A). *See* Maryland Rules (1986), Court Administration Rule 1230, Appendix F, Code of Professional Responsibility, DR 2–106 and DR 5–103(A). We shall sustain the findings and conclusion of Judge Levitz over Korotki's exceptions. Because this is a particularly aggravated case of greed overriding professionalism, this Court suspends Korotki from the practice of law for eighteen months.

DR 2–106(A) provides that "[a] lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly

excessive fee." Under subsection (B) of DR 2–106 "[a] fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee." The rule lists eight "[f]actors to be considered as guides in determining the reasonableness of the fee...." We set forth those guides in the margin.[1] DR 5–103(A) states:

"A lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation he is conducting for a client, except that he may:

(1) Acquire a lien granted by law to secure his fee or expenses.

(2) Contract with a client for a reasonable contingent fee in a civil case."

On the facts of the instant matter, there is essentially only one issue presented. If Korotki's contingent fee was clearly excessive in violation of DR 2–106, then he also has failed to stay within the exception to the prohibition of DR 5–103(A) against acquiring a proprietary interest in the clients' causes of action.

---

1. DR 2–106(B) in part reads:
 "Factors to be considered as guides in determining the reasonableness of a fee include the following:
 (1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.
 (2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.
 (3) The fee customarily charged in the locality for similar legal services.
 (4) The amount involved and the results obtained.
 (5) The time limitations imposed by the client or by the circumstances.
 (6) The nature and length of the professional relationship with the client.
 (7) The experience, reputation, and ability of the lawyer or lawyers performing the services.
 (8) Whether the fee is fixed or contingent."

Judge Levitz's report is tightly written. The vast majority of Korotki's numerous exceptions to that report complain of the omission of details which Korotki deems to be favorable. In our statement of facts we shall include most of the matter sought by Korotki, thereby denying general readers the mercy shown to them by Judge Levitz.

Korotki's clients in the action underlying these grievances were Baltimore City fire fighters.[2] On February 27, 1979, there was a fire at the premises of Cambridge Iron & Metal Co. (Cambridge) in Baltimore City. Among the responding fire fighters were Henry A. Hartman, Jr. (Hartman), Lieutenant Charles H. Brown (Brown), Glenn Wilson (Wilson), Hance L. Morgan (Morgan) and Vernon G. Sauer (Sauer). In the course of fighting the fire these individuals suffered personal injuries when an explosion occurred that apparently emanated from a metal yard box containing approximately 125 cubic feet of magnesium fines and scraps. It came to pass that Korotki was engaged to represent each of these five fire fighters as claimants for workers' compensation.[3]

Korotki obtained awards of workers' compensation for his clients. Hartman, who was later to obtain a $300,000 third party action judgment against Cambridge, was award-

---

**2.** Spouses of the fire fighters joined in the underlying action as plaintiffs in loss of consortium claims. There was no recovery on those claims. The plaintiffs whose claims are most relevant to the issues now before us are the fire fighters themselves.

**3.** Korotki excepts to that part of Judge Levitz's factual finding number five which states that "Respondent solicited both Hartman and Brown while they were in the Baltimore City Hospital Burn Unit." Korotki was not charged with having violated any disciplinary rule prohibiting unethical means of obtaining professional employment. *See, e.g.,* DR 2–103(B) and (F) and DR 2–104. Nor do we believe that Judge Levitz's factual finding, read as a whole, was intended to imply commission of an uncharged violation. The record indicates that Korotki was asked by a fire fighter who was not involved with the fire at Cambridge to consult with him at the hospital and that that fire fighter, in turn, introduced or recommended Korotki to the fire fighter plaintiffs who were also patients there. We attribute no sinister significance to the choice of words employed by Judge Levitz in the finding.

ed permanent partial disability benefits of $2,886. Brown, who recovered a $200,000 judgment against Cambridge, was awarded permanent partial disability benefits of $2,960.[4]

Judge Levitz found on sufficient evidence that, after the workers' compensation claims were concluded, Korotki

> "suggested to the firefighters that he file suit on their behalf against Cambridge Iron and Metal.... He told them that it would be a very difficult case to win. He informed them that no other firemen had won such a case but this might be a chance to change the law of Maryland."

The five fire fighters filed suit through Korotki in the Eighth Judicial Circuit on May 6, 1980.

Under Maryland law at that time a fire fighter who entered premises to put out a fire was

> "a licensee and not an invitee.... [O]wners and occupants of property owe licensees only the duty of abstaining from wilful or wanton misconduct or entrapment.... [U]nder Maryland law this encompassed a duty to warn of any hidden dangers, where there was knowledge of such danger and an opportunity to give warning."

*Sherman v. Suburban Trust Co.*, 282 Md. 238, 243, 384 A.2d 76, 79–80 (1978).

> "[S]o long as a fireman is injured by the flames or gases of the fire, apart from unusual factors operative after the fire began, and apart from a failure to warn of hidden dangers, he cannot recover from the owner since fighting the fire, however caused, is his occupation."

*Id.* at 244, 384 A.2d at 80. *Sherman* derived the above-quoted statements of Maryland law from the only two prior decisions of this Court dealing with the "fire fighters' rule," *Aravanis v. Eisenberg*, 237 Md. 242, 206 A.2d 148 (1965)

---

**4.** According to answers to interrogatories filed about six weeks before trial in the circuit court, Hartman had $11,122.37 of lost wages and medical expenses. Brown's interrogatory answers listed $6,942 in wage loss and medical expense.

and *Steinwedel v. Hilbert*, 149 Md. 121, 131 A. 44 (1925). The appellants in *Sherman* sought to present, but had failed to preserve for appeal, the argument that the duties owed by an occupier of premises should be based on ordinary negligence principles and not be based upon common law classifications of invitees, licensees and trespassers. Two members of this Court, dissenting in *Sherman,* would have adopted the rule advocated by that appellant.

When Korotki undertook the representation in the claim against Cambridge, he knew that the evidence would be that the plaintiffs entered the premises in order to fight a magnesium fire and that the defense would contend that the explosion was an explosion caused by magnesium. Thus, Korotki knew, or was chargeable with knowledge, that there were probably only three liability theories under which he could obtain judgment in favor of the plaintiffs in a contested case. First, there might be wanton and willful conduct on the part of Cambridge. It was extremely doubtful, however, that the evidence measured up to that standard, and this evaluation was shared by other attorneys with whom Korotki reviewed the proof. Second, Korotki might effect a change in the law by convincing this Court to grant certiorari on a judgment adverse to his clients and then to hold that the duty owed by an occupier of land to fire fighters is determined by general negligence law. If Korotki succeeded in effecting a change in the law, a retrial would probably have been required in order to determine liability under the new standard and, if so determined, to fix damages. Third, there might be a recovery under existing law if the facts gave rise to a duty on Cambridge to warn of a hidden danger.

When undertaking the representation, Korotki entered into written fee agreements with his clients. In March 1984, approximately one month before trial, Korotki was unable to locate those agreements. He obtained confirmations of the fee agreements in the form of written powers of attorney which included the promise of each client "to pay unto said Attorney for his services the sum of 33–⅓%

of all monies collected by way of settlement before suit is instituted, or 40% of all monies collected after suit is instituted, plus unreimbursed legal expenses."

Trial to a jury presided over by Judge David Ross was had April 2–6, 1984. Four of the claims for loss of consortium and the issue of punitive damages were decided on motion in favor of the defendant.[5] Although Judge Ross commented that the evidence was "razor thin" to establish liability, he was satisfied that there was sufficient evidence from which the jury could find that the fire fighters should have been warned about magnesium in the yard box which was remote from the obvious fire, underneath a truck, which the fire fighters were seeking to extinguish. Korotki, assisted by another attorney who had prepared the plaintiffs' requested instructions, excepted to the jury's having been instructed on distinctions between licensees and invitees. The jury returned verdicts totaling $618,000 consisting of $300,000 for Hartman, $200,000 for Brown, $100,000 for Wilson, $13,000 for Sauer, and $5,000 for Morgan. Post trial motions by Cambridge were denied, and judgment nisi on the verdicts was extended to judgment absolute. Had the judgments been paid at that moment, Korotki's fee would have been $247,200.

Cambridge appealed to the Court of Special Appeals, and, on June 5, Korotki noted an appeal in order to claim error in the circuit court's refusal to submit the issue of punitive damages to the jury.

Korotki also called a meeting of his clients which was held in Korotki's office on June 23. At that meeting the clients respectively signed documents headed "APPELLATE FEE AGREEMENT" which read:

> "WE, the undersigned, do hereby employ Abraham Paul Korotki to represent our interest with reference to an Appeal from the Circuit Court For Baltimore City,

---

**5.** The jury assessed no damages on the Hartmans' loss of consortium claim.

case number 1980/716/22542, in which the Cambridge Iron & Metal Company was the Defendant.

"WE AUTHORIZE AND EMPOWER our Attorney to prosecute and/or defend our interests in this Appeal to either the Court Of Special Appeals Of Maryland *and/*or Court Of Appeals Of Maryland. That in consideration of the services to be rendered on our behalf, we do agree to compensate him, in addition to the contingency fee agreed upon on the Circuit Court level, which was forty (40%) percent, an additional sum of twenty (20%) percent of those monies recovered on our behalf, plus all legal expenses incident thereto.

"WE FURTHER UNDERSTAND that if the Appeal is unsuccessful or we do not recover any monies, then we would not be indebted to Mr. Korotki for any services rendered on our behalf except for those legal expenses provided in the prosecution and/or defense of the original case in the Circuit Court For Baltimore City and our Appeal to the Court Of Special Appeals Of Maryland *and/*or Court Of Appeals Of Maryland."

(Emphasis added).

Korotki obtained the clients' signatures on these agreements by the means described by Judge Levitz which are set forth below. Those findings are supported by the testimony of Hartman and Brown.

"17. The firefighters were reluctant to sign this agreement but were told that if they did not agree to the 20 percent increase the Respondent would no longer represent them. He told them that he would drop the case. They were told that they would have to get another attorney who would charge them an additional 33⅓ to 40 percent if they could even get another attorney to handle the case. In any event, they would still owe the Respondent the original 40 percent. The firefighters thought that they had no real choice but to sign the additional 20 percent agreement.

"18. The Respondent never explained to the firefighters his obligation absent an appellate fee agreement to

protect their interests in the judgments entered on their behalf."

Interest at the rate of ten percent per annum was running on the judgment. If successful on appeal, and if the judgment were paid precisely one year after its entry, Korotki would have received under the original fee agreement $24,720 over and above the $247,200 calculated on the principal amount of the judgment. The fifty percent increase in the fee (twenty percentage points) increased Korotki's share of the principal amount of the judgment by $123,600 and increased Korotki's share of the interest by $12,360 per year.

In further pursuit of his alternative strategy involving the change of law advocated in the dissenting opinion in *Sherman*, Korotki petitioned this Court to hear the appeal directly and to bypass the Court of Special Appeals. That petition was denied in October 1984. 301 Md. 176, 482 A.2d 501.

Korotki had no prior experience in appellate brief writing. He engaged another attorney, his junior at the bar, to prepare the briefs for his clients as appellees and as cross-appellants. As appellees the briefs essentially argued the sufficiency of the evidence to support the hidden danger exception to the fire fighters' rule. As cross-appellants the briefs argued that the issue of punitive damages should have been submitted to the jury and suggested, contrary to the instructions given to the jury by Judge Ross, that the jury had applied the wanton and willful conduct exception in finding for the plaintiffs. Korotki reviewed and edited the drafts of the briefs prepared for him. There is an indication that Korotki paid the brief writer $2,000, but Judge Levitz made no finding on that point.

After hearing argument, the Court of Special Appeals, in an unreported opinion filed March 21, 1985, dismissed the appeal and cross appeal. The court ruled that there was no final judgment because it considered that the four consortium claims, as to which motions for directed verdict in

favor of Cambridge had been granted, were not disposed of by "judgment." That interpretation of the Rules of Procedure was erroneous. We so held in *Houghton v. County Comm'rs of Kent County,* 305 Md. 407, 504 A.2d 1145 (decided February 25, 1986), *motion for reconsideration denied, with opinion,* 307 Md. 216, 513 A.2d 291 (decided August 22, 1986). The parties to the action against Cambridge obtained from the circuit court an order which satisfied the requirements then being applied by the Court of Special Appeals for a final judgment. Cambridge and the fire fighters noted new orders of appeal.

Meanwhile the Court of Special Appeals had, on March 7, 1985, decided another fire fighters' rule case, *Flowers v. Sting Security,* 62 Md.App. 116, 488 A.2d 523. That case involved a fire in a high-rise apartment building. The plaintiff fire fighter, while searching through smoke for persons who might have been trapped in the burning building, fell twelve stories down an open elevator shaft. The provider of security services for the building and the elevator manufacturer successfully demurred to the claims against them. The Court of Special Appeals affirmed, reasoning that the modern justification for the fire fighters' rule lies in the doctrine of assumption of the risk. This Court granted certiorari on June 28, 1985, 303 Md. 418, 494 A.2d 211, both in *Sting Security* and in a companion case against the building's owner which had been decided by unreported opinion, *Flowers v. Rock Creek Terrace Ltd. Partnership* (No. 1115, 1984 Term, Court of Special Appeals).

Prior to prehearing conference in the Court of Special Appeals the clients instructed Korotki, over his advice to the contrary, that he was to accept an offer of $250,000 for all of the claims, if that offer were made. It was not.

The appeals in the action against Cambridge proceeded on the same briefs and extract which had previously been filed, except that Korotki and counsel for Cambridge each filed a supplemental memorandum addressing the impact of *Sting*

*Security* on their positions. Korotki prepared his memorandum without assistance from any other attorney.

The Court of Special Appeals affirmed. *Cambridge Iron & Metal Co. v. Hartman*, 65 Md.App. 629, 501 A.2d 877 (1985). On the liability issue that court "refuse[d] to declare, as a matter of law, that because some magnesium is perceived to be burning, the owner is immunized from responsibility for the injuries caused by magnesium which is unseen and unknown to the firefighters." *Id.* at 634, 501 A.2d at 879.

Cambridge petitioned this Court for a writ of certiorari which we issued on March 27, 1986. 305 Md. 683, 506 A.2d 254.

Korotki requested that the fire fighters meet with him again. That meeting was held on April 22, 1986. At that time each of the fire fighters was asked to sign a paper writing headed "APPELLATE FEE AGREEMENT—COURT OF APPEALS." That writing undertook to increase Korotki's contingent fee by fifteen percentage points to seventy-five percent of the gross recovery.[6]

Judge Levitz found that

---

**6.** The full text of the "APPELLATE FEE AGREEMENT—COURT OF APPEALS" reads:

"I, the undersigned, do hereby agree to compensate my attorney, Abraham Paul Korotki, an additional fifteen percent (15%), plus expenses and costs, for his representation in my case against the Cambridge Iron and Metal Company.

"I re-affirm my previous Fee Agreement with him which was a contingency agreement at the rate of forty percent (40%) on the Circuit Court level, and twenty percent (20%) on the Court of Special Appeals level.

"I fully understand that if Abraham Paul Korotki is successful, I would be indebted to him in the total percentage of seventy-five percent (75%), plus costs and expenses. I execute this Agreement with the understanding that Abraham Paul Korotki and his office has expended countless and numerous hours on my behalf. He has also expended thousands of dollars in the prosecution of my case and its appeal.

"I am authorizing this additional fifteen [percent] (15%) because I realise if Abraham Paul Korotki is unsuccessful in obtaining any monies on my behalf, I shall not be indebted to him for those

"[t]he firefighters were very reluctant to sign this agreement. One of the firefighters [Wilson] refused to sign and was told by the Respondent in the presence of the other firefighters that he no longer was represented and was asked to leave the office." [7]

■ In the discussion Korotki made oral promises to the fire fighters which were not incorporated into the writing. As found by Judge Levitz

"[t]he Respondent told the firefighters that if they signed this agreement it would also obligate the Respondent to represent them in a new trial, if necessary, that he would negotiate their Workmen's Compensation liens, guarantee that they would get 20 percent of the amount recovered in a new trial, and not require them to pay costs and expenses if the case was lost." [8]

With respect to the increase to seventy-five percent of the gross recovery, Judge Levitz made the following additional factual findings:

"25. [T]he Respondent never informed the firefighters that under the original agreement or the modified 60 percent agreement, the firefighters would owe the Re-

---

services rendered except for the legal expenses and costs on a pro-rata basis."

**7.** Korotki's motion to dismiss and brief on the merits in this Court did not exclude Wilson.

**8.** Korotki testified that the meeting was held one week after this Court, by order dated April 15, 1986, adopted the Maryland Lawyers' Rules of Professional Conduct and that it was significant that under the Rules of Professional Conduct the repayment of court costs and expenses of litigation advanced by a lawyer may be contingent on the outcome of the matter. *See* Rules of Professional Conduct, Rule 1.8(e)(1). Under this Court's order the Rules of Professional Conduct did not become effective until January 1, 1987. The order further provided "that the Code of Professional Responsibility . . . shall continue in full force and effect and shall govern the conduct of attorneys until January 1, 1987."

Bar Counsel's complaint charged a violation of DR 5–103(B) based on the foregoing. Judge Levitz's report did not address that charge, and Bar Counsel has not excepted to the omission. We dismiss that charge.

spondent nothing for legal services if no recovery were made.

"26. The firefighters were told if they refused to sign this agreement the Respondent would no longer represent them. The Respondent told them that if they refused to agree to the additional 15 percent they would still owe him 60 percent of the verdict and another lawyer would charge a 33⅓ percent additional fee.

. . . .

"29. The Respondent never advised the firefighters of his obligation to continue to represent them absent the additional 15 percent agreement. He never informed them of his obligation to protect their interests in the judgment absent their signing of this agreement. He never informed them of his obligation under the 60 percent agreement which specified representation in the Court of Appeals.

"30. Firefighter Brown and Firefighter Hartman felt that they had no choice but to sign the agreement.

"31. [T]he firefighters trusted the Respondent and depended on him to look out for their interests. They expected that he would advise them of their legal rights and obligations. They put their full faith and confidence in the Respondent."

These findings are based on sufficient evidence presented by Bar Counsel through Hartman and Brown.

By again increasing his fee, this time by twenty-five percent, Korotki sought a contingent fee of $463,500, based on the total principal amount of the five judgments. That was an increase of $216,300 over the contingent fee determined by the original agreement with his clients. Under the seventy-five percent arrangement the five clients would have shared a gross of $154,500, from which workers' compensation liens and the expenses of litigation would then be deducted. Had all five clients submitted and their judgments been upheld, they would have been earning interest on the combined judgments at the rate of $15,450

per year while Korotki was earning interest at the rate of $46,350 per year.

Korotki prepared, with only "ministerial" assistance from another lawyer, the brief submitted to this Court. He included in the brief a motion to dismiss. Based upon *Houghton,* he argued that the Court of Special Appeals had improperly dismissed the initial appeal by Cambridge and that the second order of appeal by Cambridge was too late. Korotki testified that it was he, personally, who conceived of the possible applicability of *Houghton* to his clients' case.

Oral argument in this Court was held on September 9, 1986. We had directed that the argument be confined to the motion to dismiss. The next day we dismissed the writ of certiorari as improvidently granted. *Cambridge Iron & Metal Co. v. Hartman,* 307 Md. 430, 514 A.2d 816 (1986).

In January 1987, we affirmed the judgment which the Court of Special Appeals had rendered in *Flowers v. Sting Security* resting the fire fighters' rule, as part of Maryland law, on the doctrine of assumption of the risk and on public policy grounds. *Flowers v. Rock Creek Terrace Ltd. Partnership,* 308 Md. 432, 520 A.2d 361 (1987).

Korotki presented his clients with accountings. Out of Hartman's gross recovery of $377,774.38, Korotki proposed distributing to Hartman $85,088.52, after deducting an attorney's fee of $283,330.79, a compensation lien of $5,457.23 (negotiated down from $6,822.64, according to the settlement sheet) and $3,897.84 as Hartman's forty-nine percent share of the expenses. Out of Brown's gross recovery of $250,791.43, Korotki proposed distributing to Brown $55,-152.33, after deducting an attorney's fee of $188,093.57, a compensation lien negotiated to $5,000 (from $8,140.73, according to the settlement sheet) and $2,545.53 to reimburse thirty-two percent of the expenses.

Hartman and Brown would not accept the proposed distri-

butions and complained to the Office of Bar Counsel.[9] Korotki, meanwhile, placed the funds recovered from Cambridge in an interest bearing escrow account and cooperated fully in Bar Counsel's investigation. Thereafter the matter proceeded along parallel tracks. We are advised that Hartman and Brown engaged counsel to represent them in their contract dispute with Korotki and that, after the hearing in this Court on the exceptions to Judge Levitz's report, the civil claims were settled. Resolution of the civil dispute, however, does not terminate this professional discipline proceeding.

Korotki's defense is that the fees are reasonable, or at least that they are not clearly excessive. The argument is that the claims against Cambridge presented such unique problems that seventy-five percent of the gross amount actually recovered here was not clearly excessive. Korotki's defense does not meet the substance of the analysis employed by Judge Levitz.

Under the initial fee agreement Korotki undertook to pursue the claims of his clients through all appeals. Nothing in the agreement limited the representation to trial in the circuit court. Under the original fee agreement, as confirmed in March 1984, each plaintiff appointed Korotki "to represent me (us) in connection with my (our) claim for personal injuries ... resulting from said accident." The clients agreed to pay Korotki "40% of all monies collected after suit is instituted, plus unreimbursed expenses." This agreement looked to Korotki's creating a fund from which he would be paid. If he were successful at the circuit court level in creating that fund, this agreement, which is silent as to possible appeals, necessarily meant that Korotki must

---

**9.** Morgan, Wilson and Sauer also complained to Bar Counsel's office. Their complaints were referred to an Inquiry Panel which dismissed them. The letters notifying those complainants of the dismissal were introduced into evidence before Judge Levitz by counsel for Korotki, who thereby waived the confidentiality of those inquiry panel proceedings.

be successful in retaining the judgment, if appealed, in order to be paid.

■ The ordinary rule of construction of contingent fee contracts is that, in the absence of an express provision which addresses possible appeal, services rendered by an attorney in upholding a judgment on appeal are within the undertaking under the contingent fee contract. The attorney is not entitled to any additional compensation for such appellate representation, even if the reasonable value of all of the services rendered through the successful, final outcome on appeal exceeds the fee calculated under the contingent fee agreement. *See In re Laughlin*, 265 F.2d 377 (D.C.Cir.1959); *Salinger v. Mason*, 194 F. 382, 114 C.C.A. 300 (8th Cir.1912); *Tuttle v. Claflin*, 88 F. 122, 31 C.C.A. 419 (2d Cir.1898) (contract for services in case pending on appeal in Second Circuit, with fee contingent on reversal, includes services on post-opinion motions and before United States Supreme Court); *Jackson v. Campbell*, 215 Cal. 103, 8 P.2d 845 (1932); *Pocius v. Halvorsen*, 30 Ill.2d 73, 195 N.E.2d 137 (1963); *Bounougias v. Peters*, 49 Ill.App.2d 138, 198 N.E.2d 142 (1964); *Knight v. DeMarea*, 670 S.W.2d 59 (Mo.App.1984); *Quarture v. Allegheny County*, 141 Pa.Super. 356, 14 A.2d 575 (1940); *Ward v. Richards & Rossano, Inc.*, 51 Wash.App. 423, 754 P.2d 120 (1988). But see *In re Wise*, 172 A.D. 491, 158 N.Y.S. 793 (1916) (agreement to defend against challenge to client's entitlement to property, with increase in fee "contingent upon the result of the trial," construed not to include services as appellee's counsel).

■ In the instant matter Korotki knew that, even if successful at trial, the Maryland fire fighters' rule would give Cambridge a strong incentive to appeal. Further, Korotki represented to his clients that a change in Maryland law might be required in order for them to succeed. This necessarily indicated his services could extend through review by this Court. These factors lend additional support for construing Korotki's original, forty percent, contingent

fee agreement to include services rendered in upholding a successful judgment on appellate review.

When final judgment was entered in the circuit court against Cambridge, Korotki also knew that, if the judgment were upheld on appeal, his contingent fee would be $247,-200, plus forty percent of the interest accumulating at the rate of ten percent per annum on $618,000. There seems never to have been a concern that Cambridge would not be able to pay the judgment if it were to be affirmed. Korotki had cleared the hurdle of a directed verdict and judgment *n.o.v.* before a most able and experienced trial judge. Korotki had cleared the hurdle of getting the jury verdict. Thus, the remaining contingency was the risk of reversal on appeal. That risk principally turned on whether the evidence most favorable to the plaintiffs brought the case under the exception to the fire fighters' rule for hidden dangers known by the occupier, an exception already recognized in the decisions of this Court.

■ When the principal amount of Korotki's still contingent, 40% fee became quantified; it remained subject to the prohibition against clear excessiveness and to testing for reasonableness under the factors, including the risk of the contingency, listed in DR 2–106, as well as under other relevant factors. *See* R. Aronson, *Attorney–Client Fee Arrangements: Regulation and Review* 88–93 (Federal Judicial Center 1980) (Aronson); G. Hazard & W. Hodes, *The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct,* at 82–83, 173 (1985); F. Mac-Kinnon, *Contingent Fees for Legal Services* 62–66 (American Bar Foundation 1964). For example, in *Matter of Swartz,* 141 Ariz. 266, 686 P.2d 1236 (1984), the fee actually produced by a one-third contingency agreement in a personal injury case was held to be clearly excessive under DR 2–106. The plaintiff, while setting barricades on a freeway, had been struck by a car operated by a drunk driver. The plaintiff's resulting injuries required amputation of a leg. Within months following the accident the defendant's insurers offered policy limits totaling $150,000. The offer was

accepted. Because there was a workers' compensation lien of almost $90,000, the plaintiff realized only approximately $10,000 after Swartz took a fee of $50,000. The court said "that if at the conclusion of a lawyer's services it appears that a fee, which seemed reasonable when agreed upon, has become excessive, the attorney may not stand upon the contract; he must reduce the fee." 141 Ariz. at 273, 686 P.2d at 1243.

Here the verdicts and trial court judgments against Cambridge were results, both on liability and on damages, with which Hartman and Brown were well pleased. No party to this case argues that Korotki's original fee agreement provided a clearly excessive fee, either when made or after judgment had been entered. Consequently we express no opinion on those questions. It is sufficient to say that inadequacy of compensation furnished no justification for Korotki's seeking a new agreement with his clients, increasing his fee for work he had already agreed to do.

■ In seeking the increase, Korotki also crossed the fifty percent line and acquired a greater interest in the outcome of the litigation than his clients. Without passing upon whether there can ever be circumstances justifying a contingent fee in excess of fifty percent, it is generally a violation of the rule for the attorney's stake in the result to exceed the client's stake. *See* Aronson, *supra*, at 92.

In any event, C. Wolfram, *Modern Legal Ethics* § 9.3, at 521–22 (1986), discussing permissible fees, has pointed out that

"[i]n almost every case there will be a self-defined upper limit on a permissible fee charge—the amount to which the lawyer and client have agreed. Any charge by a lawyer in excess of that figure is plainly impermissible and thus excessive or unreasonable under the lawyer codes unless the parties have made a proper agreement to modify the amount."

(Footnotes omitted).

Korotki sought to modify the fee agreements with his clients in the course of the confidential relationship of

attorney and client. When attorney and client contract during that relationship "the law makes a presumption against the attorney and in favor of the client. In such case the *onus* is on the attorney to prove the entire *bona fides* and fairness of the transaction...." *Merryman v. Euler,* 59 Md. 588–90 (1883). We have said that " '[t]o sustain a transaction of advantage to himself with his client, the attorney has the burden of showing, not only that he used no undue influence, but that he gave his client all the information and advice which it would have been his duty to give if he himself had not been interested, and that the transaction was as beneficial to the client as it would have been had the client dealt with a stranger.' " *Etzel v. Duncan,* 112 Md. 346, 350–51, 76 A. 493, 495 (1910) (quoting 4 Cyc. 960). And "the fact that the client agreed to the [amount of the fee] does not relieve the attorney from the burden of showing that the amount agreed upon was fair and reasonable." *Tucker v. Dudley,* 223 Md. 467, 473, 164 A.2d 891, 896 (1960). Consequently, if the attorney relies on a special fee agreement in defense of a disciplinary complaint that a clearly excessive fee has been charged, the attorney must demonstrate that the arrangement was made "after disclosures appropriate to the existing confidential relationship...." *Attorney Grievance Comm'n v. Wright,* 306 Md. 93, 106, 507 A.2d 618, 624 (1986).

Korotki attempts to sidestep the foregoing analysis by contending that he "had no obligation to represent the Complainants beyond the trial and verdict." Respondent's Exception No. 9. Korotki cites no legal authority for this conclusion, but indicates that ambiguity in the fee agreement concerning appellate representation should operate to exclude his having undertaken that representation. This is contrary to the authorities which we reviewed above. It is also factually contrary to Korotki's filing of an order of appeal on behalf of his clients before the sixty percent agreement was signed. Korotki further points to Bar Counsel's accepting Korotki's requested admission "[t]hat the Respondent had the right to charge the Complainants a

reasonable fee for handling the case ... in the Court of Special Appeals." The request does not relate to a matter of fact. As an abstract proposition of legal ethics, we agree. If the request is intended to characterize the first increase in the fee, the request is incorrect as a matter of law on the facts of this case.

 Korotki also requested admissions that "[a] contingent fee of 60% under the circumstances of this case is fair and reasonable" and "is not clearly excessive." To both requests Bar Counsel responded: "Admitted, except that Respondent should have addressed the appellate fee arrangements in his initial retainer agreement." We do not view the issue of whether a legal fee violates DR 2–106 to be a matter of fact which, if stipulated between the parties, is binding on this Court. The issue is one of law, or, at best from Korotki's standpoint, a mixed question of fact and law on which the circuit judge makes findings of primary fact and as to which this Court makes the ultimate conclusion.

 Korotki would also have us hold that DR 2–106 is unconstitutional because of vagueness. The argument has no merit. The regulations governing conduct of members of the bar are civil and not criminal. The United States Supreme Court has "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499–500, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362, 372 (1982) (footnote omitted). And *see In the Matter of Disciplinary Proceedings Against Schalow*, 131 Wis.2d 1, 11, 388 N.W.2d 176, 181 (1986) (sustaining against vagueness challenge prohibition of conduct involving "dishonesty, fraud, deceit or misrepresentation"). "All that is necessary is that the rule prescribe general principles so that those subject to the rule are reasonably able to determine what conduct is appropriate." *In re Charges of Unprofessional Conduct against N.P.*, 361 N.W.2d 386, 394 (Minn.), *appeal dismissed*, 474 U.S. 976, 106 S.Ct. 375, 88 L.Ed.2d 330 (1985)

(upholding against vagueness challenge rule requiring attorney under investigation to comply with "reasonable requests" of investigating authority).

 Nor need the rule meet the standards of clarity that might be required for rules governing the conduct of laypersons. In holding that the prohibition against "conduct prejudicial to the administration of justice" is not vague, we emphasized that the regulation applied only to members of the legal profession. *Attorney Grievance Comm'n v. Alison,* 317 Md. 523, 538, 565 A.2d 660, 667 (1989). And *see Howell v. State Bar of Texas,* 843 F.2d 205, 208, *reh'g denied,* 849 F.2d 1471 (5th Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 531, 102 L.Ed.2d 563 (1988); *Matter of Keiler,* 380 A.2d 119, 126 (D.C.App.1977), *overruled on other grounds,* 534 A.2d 919 (D.C.App.1987); *In the Matter of Sekerez,* 458 N.E.2d 229, 236 (Ind.), *cert. denied,* 469 U.S. 856, 105 S.Ct. 182, 83 L.Ed.2d 116 (1984). DR 2–106 operates against a background of court decisions, bar association legal ethics opinions and the traditions of a learned profession. In addition, the rule furnishes eight nonexclusive guides as standards in applying the rule.

In *United States v. Petrillo,* 332 U.S. 1, 67 S.Ct. 1538, 91 L.Ed. 1877 (1947), the Court rejected a vagueness challenge to a criminal provision of the Communications Act of 1934 prohibiting intimidating tactics to coerce a licensee to employ "any person or persons in excess of the number of employees needed by such licensee to perform actual services." DR 2–106 is much more precise. "Finally, perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights." *Flipside, supra,* 455 U.S. at 500, 102 S.Ct. at 1194. All that DR 2–106 inhibits is pushing a fee beyond the range of reasonableness. The State is not constitutionally required to draw a bright line fixing maximum fees, as if DR 2–106 were a criminally enforced price control statute.

■ Attempting to erect a procedural barrier to these proceedings, Korotki contends that Judge Levitz found that Korotki had used undue influence, although that was not a charged violation. The means employed by Korotki, however, in obtaining his clients' ostensible consents to the increases in fees are highly relevant to the issue of charging a clearly excessive fee. Whether Korotki made disclosures appropriate to the confidential relationship determines whether Korotki may even rest the increases on the two appellate fee agreements. Further, the means employed by Korotki bear on the discipline to be imposed.

Judge Levitz found on sufficient evidence that Korotki obtained the clients' signatures to the escalating fee agreements (1) by threatening to terminate his representation, (2) by representing that, in that event, the clients would owe Korotki the full fee provided by the then current agreement (forty percent and later, sixty percent), and (3) by further representing that the clients, in order to obtain substitute counsel, would have to pay substitute counsel an additional fee, ranging from thirty-three and one-third percent to forty percent. As we have seen, the original forty percent agreement included services involved in upholding the judgment in favor of the plaintiffs. There is authority for the proposition that an attorney who, without justification, terminates an agreed undertaking, is not entitled to any fee at all, not even to one based upon the reasonable value of the services already rendered. *See Houghton v. Clarke,* 80 Cal. 417, 22 P. 288 (1889). This is simply a corollary to the prevailing rule that, if the client discharges the attorney for cause, the attorney may not recover any compensation. *See* F. MacKinnon, *Contingent Fees for Legal Services* 77–80 (1964); 1 S. Speiser, *Attorneys Fees* § 4.37, at 189–90 (1973); E. Wood, *Fee Contracts of Lawyers* Sec. 68, at 201–03 (1936). There is also authority holding invalid an increase in fee obtained by an attorney through threats to terminate a representation which the attorney was obliged to continue. *See Boyle v. Waters,* 206 Mich. 515, 173 N.W. 519 (1919) (threat to withdraw following favorable verdict

unless compensation increased for appeal); *Moore v. Rochester Weaver Mining Co.*, 42 Nev. 164, 174 P. 1017 (1918); *Griffin v. Rainer*, 212 Va. 627, 186 S.E.2d 10 (1972).

 In any event, where the representation is terminated, either by the client or, with justification, by the attorney, the attorney is entitled to the reasonable value of the services—not to a higher amount produced by a contingent fee agreement. *See Vogelhut v. Kandel*, 308 Md. 183, 517 A.2d 1092 and concurring opinion (Rodowsky, J.), *id.* at 191, 517 A.2d at 1096, *aff'g* 66 Md.App. 170, 502 A.2d 1120 (1986); *Ambrose v. Detroit Edison Co.*, 65 Mich.App. 484, 237 N.W.2d 520 (1975); Ethics Committee of the Maryland State Bar Ass'n, Op. 79–19.

 Korotki did not simply fail to advise his clients of their potential rights; he gave them an evaluation of their legal and practical position which was incorrect.

Perhaps the most acute factor surrounding this charging of an excessive fee is Korotki's coming back to the well a second time. Korotki's explanation is that the sixty percent agreement was to cover services before only one appellate court, either this Court, if the petition for certiorari filed by Korotki were granted, or in the Court of Special Appeals, if that petition were denied. This position is contrary to the testimony of his clients which was accepted by Judge Levitz. It is also contrary to the terms of the agreement drafted by Korotki which expressly contemplated service before either or both appellate courts.

Korotki's principal defense before Judge Levitz was that a seventy-five percent contingent fee was not clearly excessive in this particular case. Five members of the bar of this Court who are active practitioners in the trial and appellate courts opined to that effect. In general they emphasized the uniqueness of the case, the great risk whether there would be any recovery at all, their belief that few attorneys would be willing to undertake the representation in the face of the fire fighters' rule, and the skill and determination involved in obtaining a result which exceeded anyone's

expectations. Bar Counsel presented the opinions of two active practitioners and of one academic authority on professional ethics that the fee charged was clearly excessive. No witness called by either party testified to having ever charged a seventy-five percent fee. Nor had any of these witnesses ever heard of any Maryland lawyer charging a seventy-five percent fee.

We have evaluated the fee of $471,424.36 charged the complainants, Hartman and Brown, out of their gross recovery of $628,565.81 against the factors enumerated in DR 2–106(B) in considering Korotki's overall defense and in connection with the sanction. The testimony presented to Judge Levitz would support a finding that the customary contingent fee in personal injury cases which are tried is thirty-three and one-third to forty percent. Korotki's attempt to justify seventy-five percent greatly exaggerates the complexity of the fire fighters' defense and the risk that his time and effort would be lost in seeking to overcome that defense. The exception on which Korotki won was already laid out in Maryland law which consisted of but four appellate decisions. There are personal injury cases arising out of more complicated and technical settings which are tried, won and upheld on appeal for contingent fees within the customary range. Even if the fire fighters' rule presented a somewhat more formidable obstacle in the action against Cambridge than other tort defenses might present, that difference cannot conceivably justify doubling or nearly doubling the customary fee.

From the standpoint of discipline to be imposed, the most analogous case to that before us is *Attorney Grievance Comm'n v. Kerpelman,* 292 Md. 228, 438 A.2d 501 (1981). Both Kerpelman and Korotki engaged in fee gouging "which brings the legal profession into disrepute and against which the public is entitled to protection." *Id.* at 244, 438 A.2d at 510. Kerpelman's case involved deceit by way of an intent not to be bound by a fee agreement at the time it was made. It was also Kerpelman's second violation. Kerpelman's case, however, involved a relatively mod-

est sum in relation to the $271,424.36 increase in principal amount of the fee, plus seventy-five percent of the interest thereon, which Korotki attempted to extract from the complainants, Hartman and Brown. We suspended Kerpelman for one year.

The majority of the Court have concluded that Korotki should be suspended for eighteen months. Judges Rodowsky, McAuliffe and Adkins would not suspend for more than one year.

Abraham Paul Korotki shall stand suspended from the practice of law in this State for a period of eighteen months beginning thirty days from the date of the filing of this opinion. He shall stand suspended beyond that date unless and until all costs incurred in connection with this proceeding are paid in full.

IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE BV15C FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST ABRAHAM PAUL KOROTKI.